## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| DAVID TAPIA, INDIVIDUALLY AND ON BEHALF OF ALL THOSE SIMILARLY SITUATED,<br><br>   *Plaintiff*,<br><br> v.<br><br>ARCHERY TRADE ASSOCIATION, INC., BOWTECH, INC., BPS DIRECT, LLC, CABELA'S LLC, DICK'S SPORTING GOODS, INC., HOYT ARCHERY, INC., JAY'S SPORTS, INC., KINSEY'S OUTDOORS, INC., LANCASTER ARCHERY SUPPLY, INC., MATHEWS ARCHERY, INC., NEUINTEL, LLC, PRECISION SHOOTING EQUIPMENT, INC., TRACKSTREET, INC.,<br><br>   *Defendants*. | Case No. 25-1462<br><br>**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  1. Plaintiff David Tapia, individually and on behalf of all those similarly situated, brings this action for injunctive relief and to recover damages resulting from an anticompetitive agreement between Defendants Archery Trade Association, Inc., Bowtech, Inc., BPS Direct, LLC, Cabela's LLC, Dick's Sporting Goods, Inc., Hoyt Archery, Inc., Jay's Sports, Inc., Kinsey's Outdoors, Inc., Lancaster Archery Supply, Inc., Mathews Archery, Inc., NeuIntel, LLC, Precision Shooting Equipment, Inc., TrackStreet, Inc., to raise Archery Equipment[1] prices to supra-competitive levels and to maintain them at such levels artificially.

  2. Tapia and the proposed Class assert claims under the Sherman and Clayton Acts, as well as under numerous state antitrust and consumer protection and deceptive trade practices statutes. They demand a jury trial and seek all appropriate relief.

---

[1] "Archery Equipment" refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Equipment consists of five main product markets, submarkets, or cluster markets: (i) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (ii) arrows and their non-arrowhead components, such as the shaft, fletching, and nock; (iii) arrowheads or arrowpoints, including broadheads and field points; (iv) targets, including bag targets, foam targets, and 3-D targets; and (v) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers.

## I.   <u>INTRODUCTION</u>

3.      Archery—whether for hunting or sport—has its roots in deep human history. Famously associated in the West with its mythological patrons in the ancient Greek pantheon, Apollo and Artemis, archery and bowhunting are widely practiced by cultures the world over.





*Figure 1.* Apollo and Artemis.

*Figure 2.* Young people learning archery.

4.      Today, archery is a growing sport, both recreationally and competitively. Among the factors driving this growth are advances in equipment technology, which have made archery more accessible and appealing to a broader audience.

5.      As the sport grows, so, too, does the market for Archery Equipment. Indeed, though estimates vary, the size of the global Archery Equipment market, of which the United States constitutes the vast majority, is expected to register a compound annual growth rate of 4.9% between 2022 and 2032, swelling from approximately $4.2 billion in 2022 to $6.8 billion by 2032.[2]

6.      To capture unjust profits from this growth, Archery Equipment manufacturers and certain retail outlets have, through the orchestration of the Archery Trade Association ("ATA"), colluded to establish and enforce minimum advertised pricing policies ("MAPPs" or "MAP policies") that create and maintain supra-competitive price floors for all of their Archery Equipment.

---

[2] N.B. The estimates contained in this Complaint are based on publicly available information and are subject to revision as more information and analysis become accessible to Plaintiff.

## II.    PARTIES

**A.    Plaintiff**

7.    Plaintiff DAVID TAPIA is a United States and Texas citizen who purchased one or more pieces of Archery Equipment that was manufactured by one or more of the Defendants and sold to Plaintiff at artificially inflated prices due to Defendants' conduct as alleged herein. Specifically, Plaintiff has purchased a crossbow, as well as arrows and other archery components within the Class Period, as defined below, from Amazon.com.

**B.    Defendants**

8.    Defendant ARCHERY TRADE ASSOCIATION is a Virginia corporation with its principal place of business at 117 South Valley, New Ulm, Minnesota. It is a Virginia and Minnesota citizen. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Equipment. According to the ATA, one of its primary purposes is to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." At all relevant times, the ATA engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

9.    Defendant BOWTECH, INC. ("Bowtech"), is a Delaware corporation with its principal place of business at 90554 Highway 99 North, Eugene, Oregon. It is a Delaware and Oregon citizen. At all relevant times, Bowtech was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP under the "Bowtech," "Excalibur Crossbow," "Diamond Archery," "Stryker Crossbows," and "Octane Accessories" trade names, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

10.    Defendant BPS DIRECT, LLC, d.b.a. Bass Pro Shops ("Bass Pro Shops"), is a Delaware corporation with its principal place of business at 2500 East Kearney Street, Springfield, Missouri. It is a citizen of every state of which its members are citizens. Bass Pro Shops has approximately 200 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Bass Pro Shops was a member of the ATA, sold Archery

Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

11.     Defendant CABELA'S LLC ("Cabela's") is a Delaware limited liability company with its principal place of business at 1 Cabela Drive, Sidney, Nebraska. It is a citizen of every state of which its members are citizens. Cabela's has 171 retail locations throughout the United States, as well as an internet storefront. Until 2017, Cabela's was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAPP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States. In 2017, Cabela's was acquired by Bass Pro Shops.

12.     Defendant DICK'S SPORTING GOODS, INC. ("Dick's"), is a Delaware corporation with its principal place of business at 345 Court Street, Coraopolis, Pennsylvania. It is a Delaware and Pennsylvania citizen. It has stores located throughout the United States, as well as an internet storefront. At all relevant times, Dick's was a member of the ATA, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

13.     Defendant HOYT ARCHERY, INC. ("Hoyt"), is a Utah corporation with its principal place of business at 593 North Wright Brothers Drive, Salt Lake City, Utah. It is a Utah citizen. At all relevant times, Hoyt was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

14.     Defendant JAY'S SPORTS, INC. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods"), is a Michigan corporation with its principal place of business at 8800 South Clare Avenue, Clare, Michigan. It is a Michigan citizen. Jay's Sporting Goods has two retail locations in Michigan and an internet storefront. At all relevant times, Jay's Sporting Goods was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

15.     Defendant KINSEY'S OUTDOORS, INC. ("Kinsey's"), is a Pennsylvania

corporation with its principal place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. It is a Pennsylvania citizen. Kinsey's distributes outdoor goods, including Archery Equipment, to more than 4600 retailers across the United States in addition to its own retail location and internet storefront. At all relevant times, Kinsey's was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

16.     Defendant LANCASTER ARCHERY SUPPLY, INC. ("Lancaster"), is a Pennsylvania corporation with its principal place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. It is a Pennsylvania citizen. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. At all relevant times, Lancaster was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

17.     Defendant MATHEWS ARCHERY, INC. ("Mathews"), is a Wisconsin corporation with its principal place of business at 919 River Road, Sparta, Wisconsin. It is a Wisconsin citizen. At all relevant times, Mathews was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

18.     Defendant NEUINTEL, LLC, d.b.a. PriceSpider, f.k.a. Oris Intelligence ("Oris"), is a California corporation with its principal place of business at 20 Pacifica, Suite 1000, Irvine, California. It is a citizen of every state of which its members are citizens. At all relevant times, Oris provided Defendants with software to create, track, and enforce their MAP policies. Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. At all relevant times, Oris engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

19.    Defendant PRECISION SHOOTING EQUIPMENT, INC. ("PSE"), is a Delaware corporation with its principal place of business at 2727 North Fairview Avenue, Tucson, Arizona. It is a Delaware and Arizona citizen. At all relevant times, PSE was a member of the ATA with a representative on its Board of Directors, sold Archery Equipment subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States. PSE is owned by Heritage Outdoor Group LLC.

20.    Defendant TRACKSTREET, INC. ("TrackStreet"), is a Delaware corporation with its principal place of business at 9811 West Charleston Boulevard, Suite 2-776, Las Vegas, Nevada. It is a Delaware and Nevada citizen. At all relevant times, TrackStreet provided Defendants with software to create, track, and enforce their MAP policies. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Features include on-demand notifications of MAP violations and customizable messages to send to violators. In addition, TrackStreet also helps clients to formulate pricing policies, including MAP policies. At all relevant times, TrackStreet engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States.

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, because there are more than 100 members of the class, and because at least one member of the class is a citizen of a state different from that of one of the Defendants.

22.    This Court has personal jurisdiction over each of the Defendants under 15 U.S.C. § 22 because each Defendant: (i) transacted business in the United States, including in this District; (ii) manufactured, sold, shipped, or delivered substantial amounts of product in the United States, including in this District; (iii) has substantial contacts with the United States, including this District; (iv) engaged in anticompetitive conduct that had the direct, foreseeable, and intended effect of injuring the business or property of persons residing in, located in, or doing business in the United States, including in this District; or (v) any combination of these.

Moreover, each of the Defendants, individually and collectively, purposefully directed their business activities toward and had substantial contacts with this District.

23.    Defendants, directly or through their agents, subsidiaries, affiliates, or parents, may be found in and transact business in the forum state.

24.    Defendants, directly or through their agents, engage in interstate commerce in the production, distribution, or sale of Archery Equipment.

25.    Defendants, directly or through their agents, engaged in the unlawful acts alleged herein within this District having effects within this District.

26.    Venue is proper in this Court under 28 U.S.C. § 1391, because during the Class Period, defined below, at least one of the Defendants resided in this District, transacted business in this District, and the trade and commerce described herein was and is carried out, in substantial part, in this District.

## IV.    FACTS

### A.    The Archery Equipment market is large, growing, and U.S.-dominated.

27.    As explained at footnote 1, "Archery Equipment" refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Equipment consists of five main product markets, submarkets, or cluster markets: (i) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (ii) arrows and their non-arrowhead components, such as the shaft, fletching, and nock; (iii) arrowheads or arrowpoints, including broadheads and field points; (iv) targets, including bag targets, foam targets, and 3-D targets; and (v) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers.

28.    A national participation survey commissioned by the ATA revealed that, in the United States, 9.9 million people identify as bowhunters, 17.6 million people indicate they are recreational archers, and 5.4 million individuals are competitive archers. Cassie Gasaway, *Get the Industry's Latest Archery and Bowhunting Data*, Archery Trade Association, https://archerytrade.org/get-the-industrys-latest-archery-and-bowhunting-data/ (last visited Nov. 1, 2025). Each of these activities requires the purchase of Archery Equipment.

29.    The global Archery Equipment market is estimated to grow from $4.2 billion in

2022 to $6.8 billion by 2032 with the United States comprising about 89% of that market. *See* KD Market Insights, Archery Equipment Overview, https://www.kdmarketinsights.com/reports/archery-equipment-market/296 (last visited Nov. 1, 2025). Accordingly, the vast majority of the overcharges Defendants imposed on consumers, as alleged herein, were paid within the United States.

30.    Archery Equipment is sold to consumers by retailers. The retailers obtain their Archery Equipment either directly from manufacturers or through distributors. The retailers fall into two main categories: specialty sports stores, *i.e.*, stores catering specifically to the archery or hunting market, and big box sporting goods stores, *i.e.*, stores offering equipment for a broad range of sporting activities. Many of these stores have an online presence, but Archery Equipment is also sold through online-only retailers, like Amazon.com.

31.    There are about 6000 retail outlets in the United States that sell Archery Equipment. Of those, about 1500 are archery-focused retailers. The remaining 4500 stores are a mix of general sporting goods stores, online retailers, and other businesses that sell some Archery Equipment alongside other products.

32.    Archery Equipment is expensive. According to a 2023 ATA report, only 7% of bows cost under $300, while 28% cost between $300 and $600, 16% cost between $600 and $900, 23% cost between $900 and $1200, and 19% cost more than $1200. Profit margins for bows tend to be around 27% while profit margins for accessories approach 40%.

33.    For purposes of this action, the relevant product market is the Archery Equipment market, and the relevant geographic market is the United States of America.

34.    Defendants conspired to raise prices on Archery Equipment by adopting, implementing, and enforcing MAPPs that impact millions of consumers across the United States.

35.    At all relevant times, Defendants possessed market power at the manufacturing, distribution, and retail levels in the Archery Equipment supply chain in the United States.

36.    Market power at each level of the supply chain made possible a scheme to significantly raise prices to supra-competitive levels without the risk of losing an offsetting amount in sales. With substantial market power at each level, consumers could not shift to or

substitute other companies or products to defeat Defendants' artificial price increases.

**B.    The Archery Trade Association facilitated and participated in the conspiracy.**

37.    The ATA is an industry trade association focused on the sport of archery and pastime of bowhunting. It allows for several membership types: "Retailers and Ranges," "Manufacturers & Distributors," and "Additional Membership Types." None of the membership types admit consumers, nor does the ATA list its members publicly.

38.    Between 2000 and 2023, the ATA membership ranks have quintupled, rising from 505 to over 2500 members, allowing its MAPPs to pervade the Archery Equipment industry.

39.    There are significant incentives to join the ATA, including access to member-only benefits like attendance at the ATA Trade Show, use of the ATA Connect online forum, and access to a Member Directory.

40.    The ATA reports that 80% of its members belong to businesses along the Archery Equipment supply chain, including manufacturers, distributors, and retailers. Thus, many of the ATA members are horizontal competitors in the Archery Equipment market.

41.    Through ATA events, the members have many opportunities to meet and discuss their shared financial interests, both in person and online. For example, ATA Board of Directors meetings, Retail Council meetings, and Trade Show all offer live fora for anticompetitive collusion. Likewise, the ATA Connect online platform provides a web-based forum for conspiratorial conduct. All provide regular opportunities to meet and discuss the implementation and enforcement of industry-wide Archery Equipment MAPPs.

42.    The ATA's Board of Directors consists of individuals involved in the manufacturing, distributing, and retailing of Archery Equipment. At all times relevant to this action, horizontal competitors from each level of the Archery Equipment market have been members of the Board of Directors.

43.    The ATA's Board of Directors "guides ATA actions and shapes the organization's policies and positions." At the direction and with the knowledge of its Board of Directors, the ATA has promulgated rules, guidelines, practices, and procedures that have substantially restrained retail price competition for Archery Equipment sold in the United States.



*Figure 3.* The ATA Board of Directors meets in 2021.

44.    Members of ATA's Board of Directors have openly supported strict MAPP enforcement, with one former member boasting about how seriously they take enforcing their MAPP guidelines and crediting that enforcement for his company's "really high" profits last year.

45.    The ATA also formed a Retail Council, led by several individual Board members. The Retail Council was re-established in 2016 for the purpose of improving "the industry's archery and bowhunting markets."

46.    The Retail Council meets regularly "to discuss pressing issues" and "all industry happenings." MAPPs and their enforcement are one of the regular topics at Retail Council meetings, with ATA director and Retail Council member Kurt Smith going so far as to note that the MAPPs are "probably one of the most talked about topics in the archery industry."

47.    Members of the Retail Council have supported MAPPs. In fact, one member explained that "manufacturers should create MAP policies, and retailers should honor them" because "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." Another Retail Council member has warned that "disobeying MAP policies . . . can have big consequences."

48.    The annual ATA Trade Show offers additional opportunities for archery industry

competitors to collude and is well-attended by industry participants. For example, in 2016, every major bow manufacturer, many arrow and arrowhead manufacturers, and 1168 retailers and distributors attended.

49.     Indeed, MAP policies are openly discussed at ATA Trade Shows. At one ATA Trade Show, a leading archery company posted placards around its booth reminding retailers "that it aggressively enforces its MAP policies."

50.     In addition to opportunities to meet and discuss pricing and MAPP enforcement at Board of Directors meetings and ATA Trade Shows, the ATA created a web forum for its members called "ATA Connect." The ATA describes this platform as a place that "helps you build peer connections and talk regularly with like-minded business owners."

51.     All ATA members can use the forum to "share ideas, ask questions, and get business advice." But ATA Connect had two forum sharing options, one available to all members and one available only to retailer members, perpetuating secrecy even within the industry.

**C.     The Defendants conspired to monopolize the Archery Equipment market.**

52.     Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Equipment in the United States. To implement this unlawful scheme, the manufacturer and retailer Defendants, acting through and with the aid of the ATA, agreed to implement and strictly enforce Archery Equipment MAPPs. This conspiracy was intended to and did inflate prices for Archery Equipment throughout the Class Period (defined below).

53.     This conspiracy responded to rising concern within the Archery Equipment industry about increasing price competition and diminishing profit margins. To address this concern, Defendants, via the connections made available by the ATA, ultimately agreed upon a common course of action—the adoption, implementation, and strict enforcement of MAPs—to reduce retail price competition and consequent profit reduction on Archery Equipment.

54.     The ATA heard these concerns within the industry and responded by taking an active role in facilitating the conspiracy. The ATA organized meetings and platforms for its members to discuss and develop strategies to combat price competition, ultimately agreeing on MAP implementation and enforcement.

55.     The goal of Defendants' strategy was to raise retail prices artificially on all Archery Equipment throughout the country. They succeeded in that goal, and Plaintiff and the proposed Class paid supra-competitive prices as a result.

56.     Beginning by at least 2014, Defendants agreed, combined, or conspired to artificially inflate, fix, maintain, or otherwise stabilize Archery Equipment prices in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants, acting through, in concert with, or with the aid of the ATA and other co-conspirators, agreed to implement and strictly enforce price floors for Archery Equipment under the guise of MAP policies. As a direct and proximate result of Defendants' intentional conduct, Archery Equipment prices were artificially inflated to supra-competitive levels, and Plaintiff and the proposed Class were thereby injured.

57.     Bass Pro Shops and Cabela's joined the ATA board in 2014. It was with their support and substantial influence that industry participants adopted and enforced MAP policies.

58.     The ATA's position on MAPPs was memorialized in a December 31, 2014, blog post by ATA CEO Jay McAninch, titled "MAP: United We Stand, Divided We Fall." The blog post highlighted that industry-wide adoption and enforcement were necessary for profitability and urged other manufacturers and retailers to join forces and agree to the policies:

> Unfortunately, this unprecedented interest has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale . . . .
>
> MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups . . . .
>
> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone[,] the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors, and the leader of [buying groups] ARRO [Archery Rancher and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that

examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.

We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

Thus, McAninch betrayed an awareness of the competition law concerns MAPPs implicate.

59.     The ATA's template MAPP was designed for the purpose of "protect[ing] our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming—and enforcing—a sound effective MAP policy."

60.     The ATA held a seminar at its trade show about creating and enforcing MAPPs and went on to issue a newsletter following the seminar about MAPPs, advising members who "want[ed] to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products" that they "must create [a] policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiation."

61.     Recognizing the legal predicament, the ATA's newsletter in 2015 explained that "[t]he ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

62.     This newsletter also expanded on the sample MAPP ATA offered in 2014 and then included a "three-step plan . . . to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

63.     Further, the ATA went on to publish a resource library for its members, which provided template MAPPs and additional resources for retailers and manufacturers.

64.     The ATA's push for industry-wide adoption and enforcement yielded success. For example, Defendant Kinsey's announced an updated MAP policy in June 2015. In a corresponding press release, Defendant Kinsey's explained:

MAP policies exist to benefit both retailers and manufacturers by elevating the perception of brand value, which leads to increased margins for retailers. Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

65.     But implementation of a MAP policy was not enough. Strict enforcement was necessary for the price floors to be effective because many product resellers purchase Archery Equipment from distributors or retailers (including the Retailer Defendants) as opposed to directly from manufacturers. Kinsey's June 2015 press release further explained that, as part of its MAP policy updates, it would be policing the MAP policies of Archery Equipment manufacturers, such as TenPoint Crossbow Technologies. Indeed, TenPoint Vice President explained that "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

66.     A potent example of a MAPP comes from T.R.U. Ball Archery ("TRU"). Its MAPP epitomizes policing throughout the supply chain, including with strict and escalating penalties for those who deviate from the MAPP:

New MAP Violator:

A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

Repeat MAP Violator:

*First repeat infraction*

Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.

*Second Repeat Infraction*

Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

*Three or More Repeat Infraction*[s]

Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last

six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

67.    Distributors who sold TRU Archery Equipment to other resellers—for example, Cabela's supplying a small pro shop—were subject to additional conditions and penalties:

<u>Distributor Violators</u>

T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.

*First Infraction*

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

*Second Infraction*

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

*Third Infraction*

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

68.    In a June 23, 2015, post on an industry forum called "Archery Talk," one retailer remarked, "My hope is that the ATA association [*sic*] is successful in establishing an industry wide rule set that will be enforced industry wide."

69.    MAPPs and their enforcement continued to gain acceptance throughout the industry for the next several years as they were discussed publicly and privately at the ATA.

70.    In a since-deleted March 15, 2016, article titled, "ATA Members Weigh in on MAP," the ATA reflected on its success in implementing MAP policies and highlighted its efforts to date, stating, "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft[,] and enforce MAP policies that could help manufacturers, retailers[,] and the industry."

71.    This article included statements from several Archery Equipment suppliers, including Mike Ellig, the founder of Archery Equipment manufacturer Black Gold Inc. Mr. Ellig cited the pivotal role the ATA's efforts had in propagating MAP policies: "[I]n 2014 . . . I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't

have two months to create a policy from scratch." The article further explained the use of MAP policies as conspiracy enforcement mechanisms: "Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy[] and also has 'cut off' people who wouldn't abide by it." In the article, Ellig concluded by explaining how MAP policies inflate his company's margins and by encouraging others to embrace MAP policies even if that means sacrificing short-term profits, *i.e.*, taking actions against self-interest: "It takes extra effort to get a MAP policy right, but the long-term impact of doing it right is 10 times greater than the short-term impact of getting the sale."

72.     An Archery Equipment retailer and member of buying group Archery Range and Retailers Association ("ARRO") stated, "We have to educate our dealers about holding to the MAP as much as they can . . . . Otherwise [violators will] destroy the brick-and-mortar stores." This same retailer went on to note two "MAP Issues": (i) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (ii) "Some manufacturers take the time and trouble to create MAP policies only to find they can't enforce them. That's really disappointing."

73.     These and other comments reveal the purpose of Defendants' MAP policies—to stifle competition and artificially raise prices at consumers' expense. These comments also highlight the pivotal role the ATA plays in this conspiracy:

> "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," [Archery Headquarters owner Marty] Stubstad said. "The cost of business continues to rise. For business to survive, we can't give our products and services away. Manufacturers must approach this problem like its enforcement and be determined to enforce their policies."

74.     TRU Director of Operations and ATA Board of Directors Vice Chairman Benjamin Summers discussed MAPPs from the perspective of a "large manufacturer." Mr. Summers noted the primary challenge with effectuating the Defendants' scheme was that a lack of vigorous enforcement would give competitors the opportunity to "cheat" on the agreement and steal sales by offering consumers better prices on Archery Equipment. As Summers explained, "If I'm really good at keeping my products at the MAP price, and I have a competitor

who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales."

75.    Bruce Hudalla of Hudalla Associates, a business that "helps manufacturers with MAP policies, and also tries to ensure retailers follow MAP policies," similarly stressed the importance of collective enforcement, explaining MAPPs and the ATA's coordinating role:

> MAP is a good thing for the archery industry . . . It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers—retailers and manufacturers—to operate at profitable margins . . . .

> ATA has done an excellent job [of] getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies . . . .

As Hudalla also said, "If you have a [MAP] policy, it must be enforced."

76.    Outtech marketing firm co-founder Jay Scholes noted that "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." Mr. Scholes concluded, "[i]f we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

77.    Like earlier trade shows, the 2016 ATA Trade Show featured a presentation on MAP policies by an Archery Equipment retailer, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive," and "We have to educate our dealers about holding to the MAP as much as they can . . . . Otherwise [violators will] destroy the brick-and-mortar stores." Another attendee added that "[t]he archery industry is uniting as one, understanding we are all in this together, and that unity is ultimately what will help us grow."

78.    Throughout 2016, ATA kept information and resources available for "Members Interested in MAP Policies," including "ATA resources about creating a MAP policy for your employer." These resources were exclusively available to ATA members and were included in the price of membership.

79.    In May 2016, nearly forty ATA Retail Council members met for a "strategic-planning" meeting, including Council Chairman and Jay's Sporting Goods General Manager

Mark Copeland. An August 30, 2016, article by Inside Archery included reflections on this meeting from McAninch and Copeland. McAninch noted that, "Things are changing...It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged[,] and ready to help force a better future for everyone in our industry." For his part, Copeland emphasized the ATA Retail Council's pivotal role for obtaining industry-wide agreements: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

80.     MAPP adoption and enforcement continued in 2017. Indeed, an ATA article titled "ATA Members Speak: Marketing, MAP, and What's Next" noted that MAPP "enforcement is a hot topic these days" and asked, "What's your take on MAP and why?" One archer retailer responded:

> We appreciate MAP policies and the companies that enforce them. When a company competitor enforces a MAP policy, we can stay profitable without having the showroom for a competitor who wants to undercut pricing. We started to discontinue stocking manufacturers who do not have MAP policies and don't enforce them, and those who supply Amazon.

81.     In July 2017, the ATA Board of Directors met at Hoyt headquarters and unanimously agreed to add two seats to the Board for Archery Equipment buying groups, National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With these additions, ATA's Board of Directors now consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

82.     ARRO's executive secretary emphasized ATA's crucial role in "growing archery and bowhunting in recent years," as well as its significant efforts to help "retailers be more profitable." ARRO's executive secretary also explained that ARRO's goal in joining the Board was to strengthen the relationship and communication between ARRO, ATA, and manufacturers.

83.     Shortly after the July 2017 Board meeting, the ATA published an article titled, "MAP: What is it? Why Does it Exist?" The article reiterated and expanded on ATA's long-

signaled position that industry participants should adopt MAPPs baldly explained their anticompetitive purpose *vis-à-vis* Archery Equipment retailers:

> The MAP policies level the playing field for all retailers and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth[,] and stabilize their brand.

The article also warned of the dangers price competition posed to Archery Equipment suppliers:

> [S]mall-business owners with brick-and-mortar shops lose business because they can't compete with online markets where consumers can easily compare prices with their smartphone or desktop computer. . . . Eventually, the archery industry itself suffers, which has widespread impacts, built as it is on a foundation of manufacturers and retailers supporting hunting, conservation and recreational shooting.

84.    The ATA further explained that "ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways."

85.    The ATA also outlined several actions members could implement to address price competition. For example, the ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA further urged intra-industry and inter-competitor advocacy, encouraging members to call manufacturers that do not have or enforce MAP policies and "express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

86.    The article also features a clear, conspiracy-signaling statement from Ryan Shutts, Cabela's Merchandising Director, and an ATA Retail Council member: "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

87.    The article also emphasized the artificially inflated profits Archery Equipment suppliers could reap from consumers by collectively implementing and enforcing MAP policies:

> [MAPPs] help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business....

If you follow MAP and work within that price structure...[t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences . . . .

When you're part of the solution, you'll make more money.

88.    In October 2017, ATA released additional MAP resources as part of its

introduction of the "MAP Resource Library." The corresponding press release stated:

ATA staff are compiling manufacturers' MAP policies and positing them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies[] and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.

If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.

The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wesley Lang, ATA membership manager . . . . To capitalize on these ATA-member benefits, join the Archery Trade Association today.

89.    In addition to providing a central repository for all ATA members' MAP policies,

the MAP Resource Library functioned as a conspiratorial hub where competitors functionally

signed an agreement not to compete with one another for Archery Equipment on price. Absent an

agreement or the ATA's facilitation, Archery Equipment suppliers could not institute price floors

because they could not be certain and, in fact, would not otherwise even expect, in a competitive

environment, that their competitors would not undercut their pricing to win away business.

Compiling and publishing all ATA member's MAPPs thereby ensured compliance: ATA members

now had a complete list of "competitors" that would not compete on price.

90.    Defendants TrackStreet and Oris offer digital platform programs that enable users

to track and enforce pricing policies, including MAPPs. The ATA secured special discounts with

these companies for their members specifically looking to enforce MAPPs.

91.    In a 2019 article, the ATA described TrackStreet and Oris as providing "'web-

crawlers' and other high-tech software to scour the internet for MAP violators." The article

further explained that TrackStreet and Oris "know how to find out who's violating [Archery

Equipment MAPPs], identify their fictitious names, and track them as they move around to undercut our members."

92.    On information and belief, TrackStreet's and Oris's services included not only MAPP-violator identification but also violator notice notices intended to spook violators into compliance. On information and belief, TrackStreet and Oris also offered their customers detailed tracking information on seller MAPP violations, such as when and how often the seller engaged in same.

93.    The cost of obtaining similar services can exceed $1,000 per month, and for mid-size companies can exceed $20,000 per year. Given the high price of such services, Archery Equipment industry participants would have no reason to purchase these services unless they were of substantial value to their financial bottom lines.

94.    Here, Oris and TrackStreet amplified Defendants' profitability by providing them with an efficient enforcement mechanism. If they did not, Archery Equipment suppliers would have stop subscribing to Oris and TrackStreet's services. Therefore, the financial viability of TrackStreet and Oris is inextricably intertwined with the Archery Equipment industry and its reliance on anticompetitive conduct to increase profit. TrackStreet and Oris understood and profited from their role in the conspiracy, which they actively facilitated and helped to coordinate. Accordingly, Oris and TrackStreet, share in antitrust liability with the other Defendants.

95.    In addition to the MAP Resource Library, the ATA added a since-deleted webpage specifically for MAPPs. The webpage described how a MAP policy "ensures all retailers compete fairly and evenly on service *instead of price*." (Emphasis supplied.) The webpage also outlined ATA's position that "[r]etailers are responsible for knowing MAP policies and adhering to them."

96.    In May 2018, the ATA Retail Council met near Alma, Wisconsin. This meeting included conversations about the topics they anticipated retailers to address on ATA connect. One of these topics included "Minimum advertised price policies."

97.    By at least 2019, Defendants had achieved wide-spread acceptance of MAP

policies. As a direct and proximate consequence, Defendants were able to obtain significant profits from artificially inflated Archery Equipment prices at the expense of Tapia and the proposed Class.

98.    Indeed, in a 2019 ATA article, TRU's Ben Summers boasted of the company's "'really high sales the past year" as resulting from "good MAP policies and relentless enforcement."

99.    Also in 2019, Kinsey's described its MAPP-enabled conspiracy enforcement as follows: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Kinsey's left no ambiguity: "If your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

100.    To continue to reap supra-competitive margins from artificially inflated Archery Equipment prices, the ATA emphasized the need to MAPPs constantly and expose and punish retailers and distributors who attempt to compete on price. As ATA Director of Industry Relations Kury Smith explained, ensuring MAPP compliance is "a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck" and people "who aren't worried about long-term profitability." Furthermore, Smith emphatically stressed the need for concerted action: "The big thing will always be communication and teamwork" because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

101.    On March 20, 2019, Smith hosted TrackStreet's Ryan Erickson on *Beyond the Bow*, the ATA's podcast. The episode was titled, "MAP Policies and Enforcement." Erickson explained collective action was necessary for MAPPs to inflate prices effectively, noting that "nobody wants to be the first soldier through the way . . . they tend not to turn out too well . . . [but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

102.    Defendants continued to use the ATA and other industry media to signal to the

market and their co-conspirators—and, indeed, to advocate—the cause of precluding competition and raising prices through the adoption and enforcement of MAPPs.

103.    In 2020, ATA CEO Matt Kormann published a blog post titled "CEO Blog: Importance of MAP," writing:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet—no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.

> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are running at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others do not like.

104.    The January 2020 edition of *Inside Archery* re-published previous quotations of Kinsey's Justin Gorman, who explained Kinsey's extensive efforts to discipline violators: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list." Gorman went on to explain: "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

105.    Defendants continue to signal and otherwise reaffirm their commitment to the ongoing conspiracy. This has two effects: (i) enabling compliance by those already in agreement and (ii) encouraging additional members to join. For example, in March 2020, a PSE General Manager was quoted in an *Inside Archery* article stating, "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

106.    In the December 2020 edition of *Inside Archery*, Performance Archery Manager Phaen Pittman offered that the "purchasing side is where we put a major emphasis on who we do

business with and why . . . . We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

107.    Beginning in 2021, however, the ATA began more aggressively to conceal the anticompetitive conspiracy of which it is a part. For example, the ATA began to erase references to its central role in the conspiracy from its website and even began publicly encouraging its members to call to discuss MAPP questions (rather than write).

108.    In 2022, the ATA launched a members-only ATA Retail Business Tracker Survey, which served as yet another mechanism for Defendants to engage in the clandestine sharing of competitively sensitive information. An article the ATA subsequently published on its website, "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey," outlined the process and goals of the ATA survey and explained that it hoped its members would utilize the survey data to compare their businesses with competitors.

109.    Another ATA article titled, "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," outlined just how detailed the data being offered is and included: (i) the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic; (ii) seasonal questions regarding what is trending and what is not, (iii) business challenges and what customers are saying; and (iv) which price range customers are gravitating toward, as well as the percentage of sales of each product type, including bows, accessories, and services, such as coaching or bow technician work. Indeed, the ATA itself declared that "[t]his data allows you to see how your shop compares to your peers."

110.    Leaving no room for doubt, additional advertisements confirm that the ATA collected and shared these data with the intent and purpose of reducing price competition. Indeed, the ATA completed a similar survey concerning ATA members' prices for repairs and servicing of Archery Equipment and advertised it as a way for members to "compare your service and labor rates to industry averages so you can see how you stack up against your peers."

111.    An accompanying ATA article confirmed that this is exactly how ATA members use the data. Asked, "What do you charge for your services?" one member replied, "Not enough.

I was happy to see the bow-tech [*sic*] price comparison chart at the ATA show this year[] and have intended to analyze what we charge and restructure it." The article concluded with a signal to members, admonishing them not to "sell yourselves short" and to "price your work accordingly."

112.    The Retail Business Tracker remained ATA member-exclusive until sometime in 2024. Until then, the survey compiled competitively sensitive information from ATA Board Members and distributed it to competing retailers, manufacturers, and distributors in the Archery Equipment business.

113.    Until 2024, these reports were completely unavailable to consumers. Now, consumers and other non-members can gain access to this data, but they must pay between $200 to $500 per report—a substantial barrier to access. By contrast, ATA members continue to receive these reports for free.

114.    ATA continues to urge and signal Archery Equipment competitor acceptance and strict MAPP discipline. In an ATA article titled, "Effective MAP Programs Means Nonstop Enforcement," Patrick Durkin writes, "Companies with effective MAP programs set clear policies and enforce them as if they're hunting coyotes, which means the season never ends and the challenge never dies." Further signaling concerted action, TenPoint Crossbow Technologies' Customer Relations and Training Director Barb Terry said, "Smaller dealers can't compete with people who drop their prices below MAP. If they notify us, we'll follow up on it. We don't want to see someone [*i.e.*, competitors] take money out of our customers' pockets." With apparent reference to Oris, TrackStreet, and possibly other ATA members, the article further explained that the "ATA has supporting members who can automate [the process of finding violators] so it's not so labor-intensive for the manufacturers."

**D.    The Defendants' conspiracy successfully raised prices on consumers.**

115.    Defendants' agreements to artificially raise, fix, maintain, or otherwise stabilize prices for Archery Equipment and to exchange competitively sensitive information regarding Archery Equipment have had the intended and foreseeable effect of artificially raising the prices Plaintiff and Class Members pay for Archery Equipment. Put another way, the Defendants'

horizontal agreement between would-be competitors and vertical agreement throughout the supply chain to raise prices through the implementation and enforcement of MAPPs actually did raise prices.

116.    It did so by two mechanisms: First, when many would-be horizontal competitors adhere to MAPPs, it eliminates the ability of these would-be competitors to publicly advertise lower prices and thus attract more customers and win market share, as they would in a competitive market. Irrespective of whether a retailer may ultimately offer sub-MAP pricing to an Archery Equipment consumer by different means, such as a coupon, rebate, or other discount, MAP policies prohibit the advertisement of this lower price. Therefore, there is no incentive for these would-be competitors to lower their prices when there is little-to-no chance the lower price will be recouped by the higher sales volume that a coupon, rebate, or other discount would otherwise be reasonably anticipated to yield.

117.    Second, even if some retailers do end up offering these coupons, rebates, or other discounts on MAPs, the industry-wide adoption of one price set unilaterally by the specific manufacturer would operate to artificially inflate the "starting point" price from which any such discounts would be calculated. This means that, as a result of Defendants' conspiracy, the actual price of the discounted Archery Equipment will still likely be higher than the actual price would have been in the absence of said conspiracy.

118.    The ATA itself continued to encourage its members, including Defendants, to adopt and strictly enforce MAPPs, largely contending that MAP policies ensure all retailers compete fairly and evenly on service instead of price.

119.    Defendants' conspiracy to fix prices within the Archery Equipment industry has achieved its intended effects, and those effects are reflected in ATA member statements.

120.    NABA, a one-time member of the ATA's Board of Directors, stated that its members strive for a minimum 40% profit based on the manufacturer's MAP.

121.    Upon information and belief, another retailer detailed the effects of these *de facto* price floors by asserting that most "archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set

MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get a piece of the pie."

122.    Manifestly, Defendants' exchange of key information had the effect of harming competition within the Archery Equipment market. By removing the veil between retailers on prices, supply, demand, inventory, and other key factors (which would normally force retailers to compete with one another by offering lower prices to drive sales), Defendants ultimately imposed higher prices on Tapia and the Class than would have existed had Defendants conspiracy not been in effect.

**E.    The relevant market is clearly definable.**

123.    To assess the competitive effects of Defendants' unlawful and anticompetitive conduct, *i.e.*, the antitrust conspiracy at the heart of this litigation, a relevant market must be defined. A relevant market is defined as the zone of competition among the agreeing rivals in which the agreement may have an affect competition. A relevant market also contains both a product dimension, *i.e.*, the product market, and a geographic dimension, *i.e.*, the geographic market. As reflected in the Class definitions, this case is concerned with the sale of Archery Equipment in the United States and its territories. Thus, (i) the product market is for Archery Equipment and, as alleged herein, the MAPPs created and enforced by Defendants applied to all items and price points of all Archery Equipment, and (ii) the relevant geographic market is the United States and its territories. The Defendants hold market power for all Archery Equipment throughout the United States and its territories.

124.    As alleged herein, Defendant Manufacturers are some of the most well-known brands in the Archery Equipment industry and throughout the United States and its territories. As further alleged herein, the power Defendant Manufacturers consistently held over the ATA, while holding seats on the ATA Board of Directors and ATA Retail Council throughout the Class Periods, increased their influence over the Archery Equipment market.

125.    Defendant Retailers are some of the largest sellers or suppliers of Archery Equipment in the entire geographic market. The conception of the conspiracy arose in large part due to the appointment of Bass Pro Shops and Cabela's to the ATA Board of Directors. As

alleged herein, Defendant Retailers also had power over the ATA, by consistently holding seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which only increased their influence over the Archery Equipment market.

126.    One of if not the only way these Defendant Retailers could compete for consumer sales is through price—precisely what Defendants all sought to fix through their conspiracy. Defendants' enforcement of MAPPs eliminates the competition within the Archery Equipment industry that would occur if Defendants allowed themselves to participate in legal, free-market contention for business with one another.

127.    It is well established that competition is harmed when would-be competitors collude and exchange key information such as data and strategy related to finances, pricing, inventory, or sales. When such information is shared amongst would-be competitors, any incentive to lower the price out of uncertainty about what another manufacturer, distributor, or retailer will offer is diminished.

128.    As explained above, Defendants' exchange of key information did, in fact, harm competition. Through the resources it created, including but not limited to ATA Connect and the ATA Retail Growth Interact Channel, the ATA encouraged the sharing of ideas and the asking of questions amongst Defendants, including about buying patterns, profit margins, and service prices. The ATA marketed these platforms and tools as ways to help address industry challenges, boost Defendants' bottom line, and promote archery and bowhunting.

129.    Defendants then relied this key information, which was learned through the various resources offered by ATA, when deciding to create and enforce MAPPs on the entire Archery Equipment market and the goods that they manufactured and supplied to consumers. Therefore, this knowledge eliminated any independent decision-making regarding the pricing and sales strategies offered by Defendants throughout the entire Archery Equipment market.

130.    Defendants' exchange of key information through ATA channels, platforms, resources, events, and subgroups, including but not limited to the ATA Board of Directors and ATA Retail Council, allows Defendants, individually and collectively, to monitor each other's sales, pricing, inventory, and other key items to ensure MAPPs are followed and all Defendants

are upholding the agreed-upon conspiracy.

131.    Further, where Defendants fix prices through MAPPs and restrict fair competition to service rather than price, the value of the key information exchanged through the ATA becomes vastly more valuable. Conversely and in effect, Defendants' conspiracy not only increases Archery Equipment prices to supra-competitive levels but also reduces Tapia's and Class members' choices as consumers to aesthetic ones about the sort of shopping experience they wish to have. This is hardly "free-market competition."

132.    Defendants' conspiracy to fix prices of Archery Equipment through the adoption, implementation, and enforcement of the industry-wide MAPPs and by exchanging key, competitively sensitive information continues today. Likewise, the ATA continues to endorse MAPPs and to push its members to develop and adopt MAPPs. At the same time, the ATA continues to push for technology and software to track when MAPPs are being violated. Thus, Defendants and their co-conspirators continue to express and signal to one another their continued commitment to the price-fixing agreement alleged herein in violation of federal and state laws and continue to perform their commitment to the utmost.

## V.    STATUE OF LIMITATIONS AND TOLLING

133.    Generally, consumers are unaware of the existence or prevalence of MAPPs; of how archery industry participants develop, manufacture, distribute, market, advertise, or price their products; or of the existence of an archery industry association boasting over 1000 members. Nor are consumers are that that archery industry association, the ATA, facilitates the collusion of its members in an effort artificially to raise and fix the prices that consumers pay.

134.    Tapia had no actual or constructive knowledge of Defendants' anticompetitive scheme until, at the earliest, May 30, 2025, when the first class action complaint was filed against Manufacturers, Distributors, and Retailers, or the Archery Industry in *Santarlas v. Hoyt Archery, Inc., et al*, 2:25-cv-00436 (D. Utah). Before that, there was insufficient information available to Tapia to suggest that Defendants had engaged in anticompetitive conduct to increase and maintain their Archery Equipment prices. Accordingly, he had no duty to inquire into the legality of Defendants' conduct.

135.    Moreover, even if Tapia had a duty to inquire before May 30, 2025, Plaintiff could not have discovered through the exercise of reasonable diligence the existence of Defendants' anticompetitive scheme as alleged herein before that date due, in part, to the active measures Defendants took to conceal their scheme.

136.    Indeed, Defendants' anticompetitive scheme was self-concealing in that Defendants did not allow consumers access to any insider data, insight, lessons, or other key information used to set MAP pricing and collude with other industry suppliers.

137.    Therefore, Tapia's and Class members' claims were tolled by the discovery rule, the continuing violations doctrine, and fraudulent concealment. Each purchase of Archery Equipment subject to a MAPP or MAP pricing is a new overt act causing injury to Plaintiff and the Class.

## VI.    ANTITRUST INJURY

138.    Defendants' anticompetitive conduct had, *inter alia*, the following effects: (i) price competition has been restrained or eliminated with respect to Archery Equipment; (ii) the prices of Archery Equipment have been fixed, raised, stabilized, or maintained at artificially inflated levels; (iii) indirect purchasers of Archery Equipment have been deprived of free and open competition; and (iv) consumers of Archery Equipment, who indirectly purchased their equipment for personal use, paid artificially inflated prices.

139.    The Archery Equipment that Tapia and class members purchased was in substantially the same form as when they were initially sold by Defendants. As a result, the Archery Equipment follows a traceable physical chain from Defendants to Tapia and the Class, and overcharges on Archery Equipment can be traced from Defendants to Tapia and Class members.

140.    The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of Archery Equipment. As a direct and foreseeable result of Defendants' conspiratorial conduct, Tapia and the Class paid supra-competitive prices for Archery Equipment during the Class Period.

141.    Plaintiff and the Class have sustained injury to their property and suffered

damages because they paid higher prices for Archery Equipment than they would have paid absent the Defendants' illegal, anticompetitive conduct.

142.    This is an injury of the type that antitrust laws were meant to punish and prevent.

## VII.    CLASS ALLEGATIONS

143.    Tapia brings this action as a proposed class representative under Federal Rule of Civil Procedure 23 on behalf of himself and on behalf of all similarly situated individuals and entities in the United States or its territories who indirectly purchased Archery Equipment from a Defendant, any Archery Trade Association member, or any of their co-conspirators during the Class Period.

144.    The "Class Period" is from January 1, 2024, to present.

145.    Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), for violations of the Sherman Act and Clayton Act, Tapia seeks to represent a "Federal Law Injunctive Relief Class" defined as:

> *Any natural person or entity in the United States or its territories who indirectly purchased Archery Equipment from the named Defendants, any Archery Trade Association member, or any of their co-conspirators at any time during the Class Period.*

146.    Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4), for violations of various state antitrust and consumer protection laws, Tapia seeks to represent a "State Law Damages Class" defined as:

> *Any natural person or entity in the United States or its territories who indirectly purchased Archery Equipment from the named Defendants, any Archery Trade Association member, or any of their co-conspirators in Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, West Virgina, or Wisconsin at any time during the Class Period.*

147.    For grammatical convenience, the Federal Law Injunctive Relief Class and the State Law Damages Class may be referred to collectively herein either as the "Class" or the "Classes."

148.    The Class members are so numerous that joinder of all Class members would be

impracticable. While the exact number of Class members is unknown, given the commerce at issue, there are likely thousands of Class members.

149.    Tapia's claims are typical of those of the Classes.

150.    Tapia will fairly and adequately protect and represent the interests of the Classes, and the interests of the Plaintiff are aligned with those of all other Class members.

151.    Questions of law and fact common to the Classes will prevail over individual questions because Defendants have acted on grounds generally applicable to the Classes and to each Class member.

152.    Questions of law and fact common to the Classes include but are not limited to: (i) whether Defendants and co-conspirators intentionally and unlawfully impaired or impeded competition in the relevant market; (ii) whether Defendants and co-conspirators engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Archery Equipment sold in the United States; (iii) whether Defendants' and co-conspirators' conduct caused Archery Equipment to be sold in the United States at artificially high and supra-competitive prices; (iv) whether Tapia and other members of the Classes were injured by Defendants' and co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; (v) the scope of any injunctive relief to which Tapia and the other members of the Classes are entitled; and (vi) the proper measure of damages.

153.    Class action treatment is superior to individual actions and will lead to the fair and efficient adjudication of the controversy (i) because class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary and duplicative efforts and expenses and (ii) because class action treatment will provide injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually. These benefits substantially outweigh any difficulties that might conceivably arise in connection with the managing this class action.

154.    Further, Plaintiff is not aware of any difficulties in the maintenance of this action as a class action.

155.    Conversely, the prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications and of establishing incompatible standards of conduct for Defendants.

## VIII.    CAUSES OF ACTION

156.    Plaintiff asserts the three causes of action identified below. For the avoidance of doubt, as to each cause of action: (i) Plaintiff incorporates paragraphs 1 through 155 as though fully set forth again; (ii) Plaintiff asserts the cause of action against all Defendants; (iii) the relevant product market is the Archery Equipment market; and (iv) the relevant geographic market is the United States and its territories.

**A.    First cause of action: violations of the Sherman Act.**

157.    Beginning as early as January 1, 2014, and continuing to the present, Defendants entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to raise, fix, maintain, or stabilize prices for Archery Equipment artificially in the relevant geographic market to supra-competitive levels in violation of Sections 1 and 3 of the Sherman Act.

158.    Defendants agreed between and among themselves to exchange competitively sensitive information, such as prices, output, supplies, costs, and purchasing and sales strategies and to enforce MAP policies.

159.    Defendants' conduct has had the intended anticompetitive effects, including but not limited to: (i) raising, fixing, maintaining, or stabilizing prices of Archery Equipment at an artificially high level; and (ii) eliminating or suppressing, to a substantial degree, competition among the Defendant manufacturers and retailers for sales of Archery Equipment in the relevant geographic market.

160.    On information and belief, each named Defendant has participated in one or more overt acts in furtherance of the exchange of information.

161.    Defendants' conduct is unlawful under the *per se* standard, while also being unlawful under rule of reason analysis. Defendants' agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive

justifications, such justifications could have been reasonably achieved through less restrictive means of competition than the ones Defendants actually employed.

162.     As a direct and proximate result of Defendants' contract, combination, or conspiracy, the following effects have occurred, among others: (i) price competition has been restrained, suppressed or eliminated within the relevant geographic market for the sale of Archery Equipment; (ii) prices for Archery Equipment sold by Defendant manufacturers and retailers have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the relevant geographic market; and (iii) those who purchased Archery Equipment indirectly from Defendant manufacturers or retailers, have been deprived of the benefits of free and open competition.

163.     Plaintiff and Class members have been injured and will continue to be injured in their businesses and property by paying more for Archery Equipment purchased from Defendant manufacturers and retailers or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

164.     Plaintiff and the Class are threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

165.     Plaintiff accordingly seeks equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to ensure that similar anticompetitive conduct and effects do not continue to occur or recur in the future.

**B.     Second cause of action: violations of state antitrust laws.**

166.     Beginning as early as January 1, 2014, and continuing through to the present, Defendants entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to raise, fix, maintain, or stabilize prices for Archery Equipment artificially in the relevant geographic market to supra-competitive levels in violation of the state antitrust laws identified below.

167.     Defendants agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies

and to enforce MAP policies.

168.    Defendants' conduct has had the intended anticompetitive effects, including but not limited to: (i) raising, fixing, maintaining, or stabilizing prices of Archery Equipment at an artificially high level; and (ii) eliminating or suppressing, to a substantial degree, competition among the Defendant manufacturers and retailers for sales of Archery Equipment in the relevant geographic market.

169.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade with respect to indirect purchases of Archery Equipment in violation of the following state antitrust laws:

      a.     Ariz. Rev. Stat. § 44-1401 *et seq.*,

      b.     Cal. Bus. & Prof. Code § 16700 *et seq.*,

      c.     D.C. Code § 28-4501 *et seq.*,

      d.     Haw. Rev. Stat. § 480-1 *et seq.*,

      e.     740 Ill. Comp. Stat. Ann. *et seq.*,

      f.     Iowa Code § 553.1 *et seq.*,

      g.     Kan. Stat. § 50-101 *et seq.*,

      h.     Me. Rev. Stat. tit. 10, § 1101 *et seq.*,

      i.     Mich. Comp. Laws § 445.772 *et seq.*,

      j.     Minn. Stat. § 325D.49 *et seq.*,

      k.     Miss. Code § 75-21-1 *et seq.*,

      l.     Neb. Rev. Stat. § 59-801 *et seq.*,

      m.     Nev. Rev. Stat. § 598A.010 *et seq.*,

      n.     N.H. Rev. Stat., Title XXXI, § 356 *et seq.*,

      o.     N.M. Stat. § 57-1-1 *et seq.*,

      p.     N.Y. Gen. Bus. Law § 340 *et seq.*,

      q.     N.C. Gen. Stat. § 75-1 *et seq.*,

      r.     N.D. Cent. Code § 51-08.1 *et seq.*,

      s.     Or. Rev. Stat. § 646.705 *et seq.*,

    t.     R.I. Gen. Laws § 6-36-1 *et seq.*,

    u.     S.D. Codified Laws § 37-1-3.1 *et seq.*,

    v.     Tex. Bus. & Com. Code § 15.01 *et seq.*,

    w.     Utah Code § 76-15-5 *et. seq.*,

    x.     W. Va. Code § 47-18-1 *et seq.*, and

    y.     Wis. Stat. § 133.01 *et sequitur*.

170.    Tapia and Class Members are entitled to recover damages as permitted by law for their injuries caused by Defendants' violations of the respective statutes identified above.

**C.    Third cause of action: violations of state consumer protection and deceptive trade practices statutes.**

171.    By engaging in the unfair competition or unfair, unlawful, deceptive, or unconscionable acts or practices alleged herein, Defendants violated the following state consumer protection laws:

    a.     Ala. Code § 8-19-10 *et seq.*,

    b.     Ark. Code § 4-88-101 *et seq.*,

    c.     Cal. Bus. & Prof. Code § 17200 *et seq.*,

    d.     Colo. Rev. Stat. § 6-1-101 *et seq.*,

    e.     D.C. Code § 28-3901 *et seq.*,

    f.     Fla. Stat. § 501.201 *et seq.*,

    g.     Haw. Rev. Stat. § 481-1 *et seq.*,

    h.     Idaho Code § 48-601 *et seq.*,

    i.     815 Ill. Comp. Stat. § 505/1 *et seq.*,

    j.     Kan. Stat. § 50-623 *et seq.*,

    k.     Me. Rev. Stat. tit. 10, § 1211 *et seq.*,

    l.     Mass. Gen. Laws Ch. 93A, § 1 *et seq.*,

    m.     Minn. Stat. § 325F.68 *et seq.*,

    n.     Mo. Rev. Stat. § 407.010 *et seq.*,

    o.     Mont. Code § 30-14-103 *et seq.*,

p.      Neb. Rev. Stat. § 59-1602 *et seq.*,

q.      Nev. Re. Stat. § 598.0903 *et seq.*,

r.      N. M. Stat. § 57-12-1 *et seq.*,

s.      N.Y. Gen. Bus. Law § 349 *et seq.*,

t.      N.C. Gen. Stat. § 75-1.1 *et seq.*,

u.      N.D. Cent. Code § 51-10 *et seq.*,

v.      R.I. Gen. Laws § 6-13.1-1 *et seq.*,

w.      S.C. Code § 39-5-10 *et seq.*,

x.      Tenn. Code. § 47-18-101 *et seq.*,

y.      Tex. Bus. & Com. Code § 17.41 *et seq.*,

z.      Utah Code § 13-11-1 *et seq.*,

aa.     Vt. Stat. tit. 9, § 2453 *et seq.*,

bb.     W. Va. Code § 46A-6-101 *et seq.*, and

cc.     Wis. Stat. § 100.20 *et sequitur*.

172.    On behalf of himself and the State Law Damages Class, Tapia seeks all appropriate relief provided for under the above-described statutes.

## IX.     <u>DEMAND FOR JURY TRIAL</u>

173.    Plaintiff requests trial by jury of all issues so triable.

## X.     <u>PRAYER FOR RELIEF</u>

174.    For all the foregoing reasons, Plaintiff requests judgment against Defendants as follows:

a.      that this action may proceed as a class action, with Plaintiff appointed as Class representative and his counsel appointed as Class counsel;

b.      that Defendants be found to have engaged in a contract, combination, and conspiracy in violation of federal and state laws and that Plaintiff and the Class Members have been injured in their business and property as a result of Defendants' violations;

c.      that Plaintiff and the Class may recover damages sustained by them as provided by the applicable state antitrust and consumer protection laws and that a

judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted by such laws;

        d.      that Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees, along with all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

        e.      that Plaintiff and the Class be awarded pre-judgment and post-judgment interest and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

        f.      that Plaintiff and the Class recover the costs of suit, including reasonable attorney fees as provided by law.

175.    Plaintiff further requests, on his own behalf and on behalf of the proposed Class, all such other or further relief as may be just and proper.

DATED: November 10, 2025      SIGNED:                     

Michael Montaño (*Pro Hac Vice* Forthcoming)
(Cal. Bar No. 282419, Tex. Bar No. 24076569)
**GUERRA LLP**
345 California Street, Suite 600
San Francisco, California 94104
mmontano@guerrallp.com
(726) 336-7693

Francisco "Frank" Guerra, IV.
(Tex. Bar. No. 00796684)
Sommer Hazel
(Tex. Bar No. 24138121)
**GUERRA LLP**
875 East Ashby Place, Suite 1200
San Antonio, Texas 78212
fguerra@guerrallp.com
shazel@guerrallp.com
(210) 447-0500

*Counsel for Plaintiff and the Proposed Class*